UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
MARISOL MANGUAL,                                :

                Plaintiff,                        :          <u>OPINION AND ORDER</u>

      -against-                               :
                                 20 Civ. 7526 (GWG)
COMMISSIONER OF SOCIAL SECURITY,     :

             Defendant.                         :
---------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Marisol Mangual brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] For the reasons stated below, the Commissioner's motion is denied and Mangual's motion is granted.

I. <u>BACKGROUND</u>

    A. <u>Procedural History</u>

Mangual applied for DIB and SSI benefits on March 30, 2017. <u>See</u> SSA Administrative Record, filed June 21, 2021 (Docket # 18) ("R."), at 238, 245. Mangual alleged that her

---

[1] <u>See</u> Defendant's Memorandum in Support of Motion for Judgment on the Pleadings, filed June 21, 2021 (Docket # 20) ("Def. Mem."); Defendant's Motion for Judgment on the Pleadings, filed June 22, 2021 (Docket # 21); Plaintiff's Motion for Judgment on the Pleadings, filed Oct. 18, 2021 (Docket # 29); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings and in Opposition to Defendant's Motion for Judgment on the Pleadings, filed Oct. 18, 2021 (Docket # 30) ("Pl. Mem."); Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Further Support of Defendant's Motion for Judgment on the Pleadings, filed Nov. 8, 2021 (Docket # 31) ("Def. Opp.").

disability began on December 31, 2015, when she was 47 years old.  R. 18, 238.  The Social

Security Administration ("SSA") denied both of Mangual's applications on May 22, 2017, R.

140, 141, and Mangual sought review by an Administrative Law Judge ("ALJ"), R. 168, 169.  A

hearing was held on May 10, 2019.  R. 117.  In a written decision dated July 31, 2019, the ALJ

found Mangual to not be disabled.  See R. 9-20.  On August 27, 2019, Mangual sought review by

the Appeals Counsel, see R. 5, which denied her request on July 17, 2020, R. 1.  This action

followed.

      B.  The Hearing Before the ALJ

The hearing was held by video conference before an ALJ in Hartford, Connecticut.  R.

115.  Mangual, represented by counsel, participated from the SSA's "Varick, New York Hearing

Offices."  R. 117.  A vocational expert, Larry Takki, was also present via telephone.  Id.

Mangual testified that she lived in a separate room in an apartment that housed three

other residents.  R. 123.  She said that she did not typically prepare her own meals, but rather

contributed money towards a shared meal with her cohabitants in the apartment.  R. 130-31.  She

said that she was able to shower and dress herself, R. 131, but that her children cleaned her room

and did her laundry, id.  Mangual denied socializing outside of her home except when visiting

her grandchildren.  R. 131-32.

Mangual testified that her work history included some self-employment income derived

from buying and re-selling t-shirts.  R. 125.  Mangual had no other work history that was noted at

the hearing, and the ALJ found that Mangual's employment record included no past relevant

work.  Id.

Mangual testified that the highest level of education she completed was ninth grade.  R.

124.  She was not able to drive and she struggled to navigate public transportation without the assistance of her children.  R. 124, 126.  Mangual struggled to read and understand correspondence from the SSA, and required the assistance of her children to do so.  R. 127.  She did not know how to write a letter by herself.  Id.

Mangual also testified that, due to her back pain, she had a limited ability to sit and stand, and was able to stand for only 10 or 15 minutes without needing to sit.  R. 128.  She experienced arthritis pain "[a]lways" in her feet and hands.  Id.  Mangual had a pinched nerve in her shoulder and an unexplained issue with her ligaments.  R. 129-30.  Mangual has asthma, for which she uses an inhaler twice daily.  Id.

Mangual testified that she used marijuana every other day to relax and alleviate her various sources of pain.  R. 129.  Mangual testified that she had, a month prior to the hearing, gone to inpatient rehabilitation for cocaine use, but that she was not currently using cocaine.  R. 132-33.

The ALJ consulted a vocational expert ("VE"), Larry Takki, by phone.  The VE did not review Mangual's history of self-employment work, as the ALJ had already made a finding that Mangual had no past relevant work.  R. 125, 135.  The ALJ asked the VE the following question:

> First, considering an individual of the Claimant's age, education, and work history with the ability to perform all ranges of work.  This individual must avoid dust, fumes, gases, odors, poor ventilation.  And this individual is able to perform simple, routine tasks.  Is there work in the national economy for somebody with those abilities?

R. 135.  The VE responded that there were several occupations with available employment, including a price marker, a sub-assembler of electronics, and routing clerk, all of which were unskilled, light duty positions.  Id.

The ALJ then asked whether these positions would be available if the individual from the hypothetical "were unable to read and write in English," R. 135, to which the VE replied

> The price marker [would] have to recognize numbers because they're putting prices on merchandise, so there would have to be some literacy.  However, the sub-assembler of electronics and the routing clerk   well, the routing clerk would also need to . . . have some basic alphabet skills to do that job.  But the sub-assembler of electronics could be performed through demonstration and through (INAUDIBLE) individual's . . . illiteracy . . . in order to do this occupation.  In the past, I've placed people who could do this job who were illiterate, but not the other two.

R. 136.  The ALJ then asked whether there was any "other work in the national economy for somebody with those abilities."  Id.  The VE responded that work as a cafeteria attendant, "could be performed through demonstration and such" and that this position "does not require any illiteracy   very much literacy."  Id.  The VE also identified work as an assembler of communication equipment.  Id.  Both positions were unskilled, light duty occupations.  Id.

At the outset of the hearing, Mangual's attorney argued that Mangual may meet the listing for an intellectual disability.  R. 118.  Counsel highlighted that Mangual had "a ninth-grade education, in which she only attended specialized school," and that she was "barely able to read and write."  R. 119.  Counsel suggested that evidence could be obtained that would substantiate this disability:

> [N]ew IQ testing, or intelligence testing, along with either if we can locate school records, or if we can get a signed statement from a person with knowledge who can attest that she did attend specialized schooling would be sufficient to meet that listing.  We have . . . to get information going back prior to age 22.

Id.  The ALJ agreed that he and counsel could "look at that after the fact and sort that issue out" and that it was "possible to meet the burden" of showing an intellectual disability with the evidence counsel had outlined.  R. 120.  The ALJ resolved to continue the hearing as to

4

Mangual's other potential sources of disability, and agreed to "put the matter into post" so that Mangual could be sent to a psychologist for intellectual testing.  Id.  The ALJ revisited the issue near the end of the hearing, explaining that the matter would be "in post" and so Mangual could submit any additional records relating to her claimed intellectual disability over the next 15 to 30 days.  R. 138.  The ALJ concluded by saying that "[g]iven a potential vocational intellectual disability claim, I think we have to do all we can to develop the file."  Id.

  C.  The Medical Evidence

  Both Mangual and the Commissioner have provided detailed summaries of the medical evidence.  See Def. Mem. at 3-9; Pl. Mem. at 2-7.  The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed Oct. 20, 2020, ¶ 3 (Docket # 10), and neither party has done so.  Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case in Section III below.

  D.  The ALJ's Decision

  The ALJ denied Mangual's application on July 31, 2019.  R. 9.  The ALJ first found that Mangual met "the insured status requirements of the Social Security Act through December 31, 2018."  R. 12.  Then, following the five-step test set forth in SSA regulations, the ALJ found at step one that Mangual had not engaged in "substantial gainful activity since December 31, 2015," the alleged onset date of Mangual's disability.  Id.

  At step two, the ALJ found that Mangual had the following severe impairments: "asthma; bipolar disorder; anxiety disorder; panic disorder."  Id.  The ALJ found that certain of Mangual's

other conditions, such as her "scoliosis, osteoarthritis of the right shoulder, cocaine and cannabis use disorder," were non-severe, as they "pose minimal limitations on her functioning." Id.  The ALJ explained that Mangual's medical records, although "very vague, show[ed] normal physical functioning, despite some notations of various complaints." Id.  The ALJ also explained that Mangual's "alleged intellectual disability is not medically determinable as there are no records showing evidence of this impairment." Id.  Even so, the ALJ stated that he would incorporate Mangual's representations that she could not read or write in English into the RFC. Id.

At step three, the ALJ concluded that none of Mangual's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.  The ALJ specifically considered listings 3.03 (asthma), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). See R. 12-13.  The ALJ concluded that Mangual did not meet the criteria for 3.03 as she had not suffered "chronic asthmatic bronchitis or attacks, in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year." Id.  The ALJ utilized the "paragraph B" criteria, which require a claimant to possess one "extreme" or two "marked" limitations among the four broad areas of mental functioning, to conclude that Mangual did not meet the criteria for 12.04 and 12.06. R. 13.  The ALJ concluded that Mangual had a mild limitation in "understanding, remembering, or applying information," a mild limitation in interacting with others, a moderate limitation in "concentrating, persisting, or maintaining pace," and a mild limitation in "adapting or managing oneself." Id.  Because Mangual did not have at least two "marked" limitations or one "extreme" limitation, the ALJ found that the paragraph B criteria were not satisfied. Id.  The ALJ also found that the

"paragraph C" criteria were not satisfied, as there was "no evidence of the serious and persistent disorder described in paragraph (C) nor has the claimant received treatment in a highly structured setting or exhibited marginal adjustment."  R. 14.

The ALJ then assessed Mangual's residual functional capacity ("RFC") pursuant to step four.  Id.  The ALJ determined that Mangual possessed the ability to "perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant must avoid dust, fumes, gases, odors and poor ventilation.  She retains the mental capacity to perform simple, repetitive, routine tasks."  Id.  The ALJ found that Mangual's "medically determinable impairments could reasonably be expected to cause [Mangual's] alleged symptoms," but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  R. 15.

The ALJ reviewed the medical opinion evidence in the record, including the results of a psychiatric exam by Dr. Arlene Broska on May 3, 2017.  R. 16.  The ALJ found the opinion persuasive as to its conclusion that Mangual could perform simple tasks, but expressed disagreement with Dr. Broska's conclusion that Mangual had "'moderate' limitations in social interactions, as she is always cooperative with treating sources, and is able to use public transport and shop."  Id.  The ALJ next reviewed a medical examination by Dr. Carol McLean Long, MD, which also took place on May 3, 2017.  Id.  While Dr. Long concluded that Mangual had "mild to moderate limitation in the . . . ability to sit, stand, walk, climb, push, pull, or carry heavy objects," the ALJ found this aspect of the opinion not persuasive, as it failed to specifically identify or explain "the actual limitation in claimant's physical activities."  R. 17.  The ALJ

7

noted, based on Dr. Long's opinion, that Mangual had a "mostly normal range of motion" and that "her activities of daily living show that she has no limitations in physical functioning, despite her arthritis and back pain." Id. Finally, the ALJ reviewed the opinion of David Schaich, who gave a psychological examination to Mangual on June 23, 2019, following Mangual's ALJ hearing. Id. The ALJ concluded that the opinion "supports a conclusion that [Mangual] can perform simple, unskilled tasks." R. 18. However, in view of a statement from Mangual's mother indicating that Mangual had been in "special education" while in school, the ALJ opted to add the limitation that Mangual could not read or write. Id.

At step four, the ALJ noted his finding that Mangual had no past relevant work. Id. The ALJ concluded that the "[t]ransferability of job skills" was therefore not an issue. Id.

At step five, the ALJ considered Mangual's "age, education, work experience, and [RFC]" to conclude that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 19. The ALJ concluded that Mangual could perform work as a cafeteria attendant, assembler, and electronic subassembler, all of which are light exertion, unskilled occupations. Id. The ALJ explained that, in so finding, he was relying on the testimony of the VE, which he determined to be "consistent with the information contained in the Dictionary of Occupational Titles." Id. The ALJ therefore concluded that Mangual was not disabled under the Act. Id.

II. GOVERNING STANDARDS OF LAW

A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(per curiam) (punctuation omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015)

(per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  "Even

where the administrative record may also adequately support contrary findings on particular

issues, the ALJ's factual findings must be given conclusive effect so long as they are supported

by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam)

(punctuation omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the

Commissioner's final decision, that decision must be upheld, even if substantial evidence

supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454

(S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).

Importantly, it is not a reviewing court's function "to determine de novo whether [a

claimant] is disabled."  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (punctuation omitted);

accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).  Rather, substantial

evidence is "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at

375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008).  "It means      and means

only     such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (punctuation omitted).  The

"threshold for such evidentiary sufficiency is not high."  Id.  The Second Circuit has held that

"[t]he substantial evidence standard means once an ALJ finds facts, [a court] can reject those

facts only if a reasonable factfinder would have to conclude otherwise."  Brault v. Soc. Sec.

9

Admin. Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original,

punctuation omitted).  "The role of the reviewing court is therefore quite limited and substantial

deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454

(punctuation omitted).

     B. <u>Standard Governing Evaluation of Disability Claims by the Agency</u>

     The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see id.

§ 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

     To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam);

Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

     Regulations issued pursuant to the Act set forth a five-step process that the Commissioner

must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his or her age, education, or work experience.  See id. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one     that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

   C.  The Duty to Develop the Record

When an ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's medical history for at least a 12-month period.  42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d); see Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings . . . .") (citing cases); accord Sims v. Apfel, 530 U.S. 103, 111 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits"). The governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination.  42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(d), 416.912(d).  The regulations define this as, at a minimum, "the records of [a claimant's] medical source(s) covering at least the 12 months preceding the month in which" a claim is filed.  20 C.F.R. §§ 404.1512(d)(2), 416.912(d)(2).  The ALJ's duty to develop the record remains regardless of whether the claimant is represented by counsel.  Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); accord Cancel v. Colvin, 2015 WL 865479, at *5 (S.D.N.Y. Mar. 2, 2015) (citing cases).

Furthermore, this duty "encompasses not only the duty to obtain a claimant's medical records and reports, but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." Pena v. Astrue, 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008).  Where the ALJ fails to develop the record, remand is appropriate.  Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999).

The obligation to develop the record is "enhanced when the disability in question is a psychiatric impairment."  Lacava v. Astrue, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27,

2012); accord Gabrielsen v. Colvin, 2015 WL 4597548, at *4 (S.D.N.Y. July 30, 2015) (citing

cases).  "This 'heightened duty' derives from the fact that a claimant's mental illness may greatly

impede an evaluator's assessment of a claimant's ability to function in the workplace, thus

necessitating a more thorough review." Marinez v. Comm'r of Soc. Sec., 269 F. Supp. 3d 207,

215 (S.D.N.Y. 2017); accord Gabrielsen, 2015 WL 4597548, at *4 (noting that an individual

with a mental disorder often "adopt[s] a highly restricted and/or inflexible lifestyle within which

they appear to function well") (citation and internal quotation marks omitted); accord SSR

85  15, 1985 WL 56857 (S.S.A. Jan. 1, 1985) (noting that the "highly restricted and inflexible

lifestyle" of individuals with mental disorders may cause difficulty meeting the requirements of

even low-stress jobs).

At the same time, it is well established that "where there are no obvious gaps in the

administrative record, and where the ALJ already possesses a 'complete medical history,' the

ALJ is under no obligation to seek additional information in advance of rejecting a benefits

claim." Rosa, 168 F.3d at 79 n.5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996));

accord Perez, 77 F.3d at 48 (where the ALJ had "already . . . obtained and considered reports"

from treating physicians, the ALJ "had before him a complete medical history, and the evidence

received from the treating physicians was adequate for him to make a determination as to

disability").

III.  DISCUSSION

Mangual raises four grounds for reversing the ALJ's decision: (1) the ALJ failed to

develop the record, Pl. Mem. at 14-18; (2) the ALJ substituted his judgment for the medical

opinions in the record, id. at 18-19; (3) the ALJ failed to make sufficient findings to permit

meaningful judicial review and his RFC determination is unsupported by substantial evidence, id. at 19-22; and (4) the ALJ erred at Step 5 by failing to address discrepancies between the Dictionary of Occupational Titles ("DOT") and the VE's testimony, id. at 22-24.  We address each ground next.

A.  Whether the ALJ failed to develop the record

Mangual argues that "the ALJ failed to develop the record by not obtaining psychiatric treatment records, special education records, physical therapy records, pain management records, and psychometric testing."  Pl. Mem. at 15.  Mangual notes that the medical records before the ALJ spanned only 140 pages.  Id.  In particular, Mangual faults the ALJ for not exploring "references in the record to physical therapy, pain management, and a recommendation for a back brace."  Pl. Mem. at 16 (citing R. 388).

As noted above, the ALJ must "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" a disability determination.  42 U.S.C. § 423(d)(5)(B).  Where an ALJ fails to do so, remand is appropriate.  See Rosa, 168 F.3d at 82-83.  However, it is well established that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  Id. at 79 n.5 (citing Perez, 77 F.3d at 48).

The Court concludes that the ALJ did not fail to develop the record as to Mangual's alleged intellectual disability.  Mangual submitted a statement by her mother indicating that Mangual had attended special education classes, and the ALJ's decision stated that it took this

information "into account, even though no school records have been provided." R. 18. The ALJ

also, as a result of Mangual's mother's letter, "added the limitation that the claimant cannot read

or write." Id. The ALJ also ordered that Mangual be psychologically examined a second time,

pursuant to Mangual's request, see R. 120, and Mangual was examined after the hearing by Dr.

Schaich, R. 505-13. Mangual did not identify any additional measures that were necessary to

inform the ALJ's assessment of her claimed intellectual disability. The ALJ adopted the only

limitations Mangual appeared to seek at her hearing: that she could not read or write. See R. 18,

119.

With regard to Mangual's argument that the ALJ failed to develop records relating to her

"psychiatric treatment records" and "psychometric testing," Pl. Mem. at 15, the Court notes that

the record included Mangual's May 3, 2017 examination by psychologist Arlene Broska, PhD, R.

384, and her June 23, 2019 examination with psychologist David Schaich, R. 505. Mangual has

not identified any defects with these examinations. The Court concludes that, because the ALJ

had "already . . . obtained and considered reports" from treating physicians, the ALJ "had before

him a complete medical history, and the evidence received from the treating physicians was

adequate for him to make a determination as to disability." Perez, 77 F.3d at 48. Furthermore,

although Mangual argues that the ALJ failed to obtain and review records relating to her

psychiatric treatment with Montefiore Hospital and Medical Center ("Montefiore"), see Pl. Mem.

at 16, defendant requested those records from Montefiore, see R. 380, and received a reply

indicating that Montefiore possessed no such records, see R. 394. The ALJ sent a follow-up

request to Montefiore and received records relating to a single emergency room visit. See R.

307, 397-414. This satisfied the ALJ's duty to seek records as set forth in SSA regulations. See

20 C.F.R. § 404.1512(b)(1) (obligating ALJs to make "every reasonable effort" to obtain medical records).  In any event, because the ALJ possessed sufficient records as to Mangual's psychiatric health and intellectual abilities, the Court concludes that there was no failure to develop the record in this area.

Mangual contends that the ALJ failed to obtain sufficient records relating to Mangual's appointments for physical therapy.  See Pl. Mem. at 16.  Although not dispositive, the Court notes that an intellectual disability was the only area of the record that Mangual identified as needing supplementation at the ALJ hearing.  See R. 118-20, 138.  Mangual's counsel mentioned the physical therapy records in an April 17, 2019 letter, which stated that Mangual would submit those records once received from Mount Sinai St. Luke's Hospital.  See R. 331.  Mangual does not provide an explanation for this failure to submit the records, nor does Mangual address her counsel's representation to the ALJ that the record was complete.  In any event, the ALJ concluded that Mangual met the insured status requirements of the Act only through December 31, 2018, see R. 12, and it is therefore unlikely records of physical therapy that "started March 2019," see R. 331, would have meaningfully influenced the ALJ's decision.  Because nothing Mangual has argued suggests that this constitutes a "glaring gap" in the evidence, and because Mangual's counsel represented to the ALJ that the record was complete, we discern no error in the ALJ's development of the record.  See Jaquish v. Comm'r of Soc. Sec., 2017 WL 3917019, at *9 (N.D.N.Y. Sept. 6, 2017) ("The duty to assist in developing the record does not go so far as to require the ALJ to independently search for every available record in existence, particularly where a claimant's representative expresses a belief that the record is complete and there was no obvious or glaring gap in the evidence that would have alerted the ALJ that the representative

was incorrect.").

    B.  <u>Whether the ALJ substituted his judgment for the medical opinions in the record</u>

       Mangual argues that the ALJ substituted his judgment for the medical opinions in the record, and, specifically, that the ALJ improperly disregarded Dr. Long's opinion that Mangual had "mild to moderate limitation in [her] ability to sit, stand, walk, climb, push, pull, or carry heavy objects."  Pl. Mem. at 18 (quoting R. 391).

       The Second Circuit has held that "while an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him."  <u>McBrayer v. Sec'y of Health and Human Servs.</u>, 712 F.2d 795, 799 (2d Cir. 1983) (internal quotation marks and citations omitted) (applying the principle to a written report).  Notwithstanding the foregoing, "[t]here is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations."  <u>Pellam v. Astrue</u>, 508 F. App'x 87, 89 (2d Cir. 2013).  Where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required."  <u>Monroe v. Comm'r of Soc. Sec.</u>, 676 F. App'x 5, 8 (2d Cir. 2017) (punctuation and citation omitted).  Additionally, an ALJ is entitled to accord  "less weight" to a consultative examiner's opinion based on claimant's "ability to engage in various activities of daily living," <u>Pappas v. Saul</u>, 414 F. Supp. 3d 657, 680 (S.D.N.Y. 2019); <u>accord</u> <u>Allen v. Comm'r of Soc. Sec.</u>, 351 F. Supp. 3d 327, 340-41 (W.D.N.Y. 2018), as well as medical evidence in the record, <u>see</u> <u>Graham v. Berryhill</u>, 397 F. Supp. 3d 541, 556 (S.D.N.Y. 2019).

       Here, we do not believe the ALJ erred in giving limited weight to Dr. Long's findings.

Although an ALJ may not reject a medical opinion "solely on the basis that the opinion[]

allegedly conflicted with the physicians' own clinical findings," Balsamo v. Chater, 142 F.3d 75,

80 (2d Cir. 1998), the ALJ here provided several reasons for his decision.  First, the ALJ

correctly noted that Dr. Long's opinion was "vague" insofar as the range of "mild to moderate"

did not identify "the actual limitation in claimant's physical abilities."  R. 17.  Not only did Dr.

Long's opinion leave unanswered which of the categories of activity were limited to a mild

extent and which were limited to a moderate extent, Dr. Long did not identify which of

Mangual's ailments contributed to the "mild to moderate limitation in [her] ability to sit, stand,

walk, climb, push, pull, or carry heavy objects." R. 391.  Because the ALJ could not have known

which conditions and clinical findings informed Dr. Long's conclusion, the findings could not be

compared with the medical evidence in the record.  Nor did Dr. Long's opinion provide the ALJ

with any clear picture as to how these limitations would impact Mangual's physical capacity to

perform work    e.g., how many hours could she sit or stand.  See Curry v. Apfel, 209 F.3d 117,

123 (2d Cir. 2000) (finding medical opinion that a claimant had "moderate" limitations for lifting

and carrying and "mild" ones for standing, walking, pushing, pulling, and sitting was too

"vague").

   Second, the ALJ identified inconsistencies between Dr. Long's opinion and medical

evidence in the record, such as Mangual's "mostly normal range of motion." R. 17.  The ALJ

noted an additional reason not to credit Dr. Long's findings: Mangual's decision not to follow

treatment recommendations.  See id.  The ALJ concluded that Mangual's decisions to decline a

recommended surgery on her left shoulder and injections to alleviate pain in her back, see R. 388,

suggested that the underlying conditions were not severe and did not support the limitations

18

found by Dr. Long, see R. 17.

Third, the ALJ found Dr. Long's findings to be inconsistent with Mangual's activities of daily living, which "show that she has no limitations in physical functioning, despite her alleged arthritis and back pain." R. 17. Dr. Long noted that Mangual could "cook seven days a week, clean daily, and do laundry weekly," and that she "showers, bathes, and dresses herself daily." R. 389. Mangual represented that she was able to shop in stores for herself, R. 292, and go to church every week, R. 293, which belied Dr. Long's findings of mild to moderate physical limitations. Indeed, in her examination by Dr. Schaich, Mangual reported that "[s]he can dress, bathe, and groom herself, cook and prepare food, clean, do laundry, shop, and manage money. . . . She takes public transportation on her own." R. 508.

Accordingly, "substantial evidence supported the ALJ's decision not to adopt" Dr. Long's conclusions regarding Mangual's physical limitations. Pellam, 508 F. App'x at 90. The ALJ reasonably drew from medical evidence in the record and Mangual's activities of daily living to not rely on Dr. Long's vague conclusions that Mangual had "mild to moderate limitation" in certain areas of her physical functioning.

Mangual also challenges the ALJ's decision not to limit Mangual's RFC based on Dr. Broska and Dr. Schaich's opinions     namely, their conclusion that Mangual had moderate limitations in "interacting adequately with supervisors, coworkers, and the public and regulating emotions, controlling behavior, and maintaining well-being." Pl. Mem. at 19. The RFC did, however, contain a limitation that Mangual "retains the mental capacity to perform simple, repetitive, routine tasks." R. 14. The ALJ found that Mangual had only a mild limitation in interacting with others, as she "exhibits few significant social deficits when interacting with

treating and examining sources," and "is capable of effectively conveying information in a socially appropriate manner with no evidence of communicative deficits."  R. 13.  The ALJ also noted that she "takes public transportation and shops."  Id.

When evaluating Dr. Broska's opinion, the ALJ reiterated his reasons for finding Mangual mildly rather than moderately limited in social interactions, highlighting that "she is always cooperative with treating sources, and is able to use public transport and shop."  R. 16. We can glean from the ALJ's decision that his departure from Dr. Schaich's opinion that Mangual was moderately limited in social interactions, see R. 17, was for the same reasons.

We conclude that the ALJ did not err in partially rejecting the findings of Dr. Broska and Dr. Schaich, as substantial evidence supported the ALJ's conclusion that Mangual was mildly, rather than moderately, limited in her ability to interact with others.  The ALJ's reasoning that Mangual often interacted normally with medical professionals is supported by the record.  See R. 375 (Mangual had "normal affect; normal behavior"); R. 403 (Mangual was "cooperative," "speech clear, oriented X 3, normal affect, responds appropriately to questions"); R. 470 (Mangual was "cooperative," and her behavior was "unremarkable").  While Mangual argues that she has left hospitals against medical advice and has been noncompliant in taking certain prescribed medication, see Pl. Mem. at 20, the ALJ was entitled to conclude that these incidents did not reflect on Mangual's capacity for social interaction.  Furthermore, although the ALJ did not specifically advert to these findings, the state agency examiners found that Mangual was only mildly limited in her ability to interact with others.  See R. 146, 155.

C    Whether the ALJ made sufficient findings for judicial review and whether the RFC is supported by the record

20

While Mangual styles her next argument as focusing generally on the sufficiency of the ALJ's findings and the support for the RFC determination, see Pl. Mem. at 19, Mangual more specifically takes exception to the ALJ's treatment of certain medical evidence in the record. Mangual argues that the ALJ failed to properly explain how he analyzed    and incorporated into the RFC    opinion evidence regarding Mangual's limitations in two of the four broad areas of mental functioning.  See id. at 20-21.  Mangual argues that the ALJ did not explain his reasoning for rejecting Dr. Broska and Dr. Schaich's findings that Mangual had a moderate limitation in "interacting with supervisors, coworkers, and the public," as well as a moderate limitation in "regulating emotions, controlling behavior, and maintaining well-being."  Id.  Mangual also argues that the ALJ failed to "explain adequately his finding that Ms. Mangual has the capacity for a full range of work at all exertional levels."  Id. at 21.

First, we reject Mangual's arguments that the ALJ did not address Dr. Broska's finding that Mangual had a "moderate limitation interacting adequately with supervisors, coworkers, and the public."  See id. at 19-20.  Mangual contends that when the ALJ referred to this limitation as "'moderate' limitations in social interactions," R. 16, this was "unclear" because it was "not a term Dr. Broska used," Pl. Mem. at 20.  Mangual complains that the ALJ later referred to Dr. Schaich's finding on her "limitation in the ability to interact adequately with supervisors, coworkers, and the public" as her "ability to socialize."  Pl. Mem. at 21.  We do not discern any ambiguity in the ALJ's use of the phrase "ability to socialize" for this dimension of mental functioning.  Furthermore, as set forth above, we believe the ALJ's decision to find Mangual mildly rather than moderately limited in social interactions was supported by substantial evidence.

21

Mangual contends that the ALJ failed to support and explain his decision not to credit Dr.
Schaich and Dr. Broska's conclusions that Mangual was moderately limited in "regulating
emotions, controlling behavior, and maintaining well-being."  Pl. Mem. at 20-21.  We agree that
the portions of the ALJ's opinion that addressed each of these opinions did not specifically
explain his reasons for rejecting their opinion that Mangual was moderately limited in this area.
See R. 16-18.  However, the ALJ did note that Dr. Broska's opinion was "consistent with the
claimant [being] capable of performing simple tasks."  R. 16.  The ALJ similarly found Dr.
Schaich's opinion to "support[] a conclusion that [Mangual] can perform simple, unskilled
tasks."  R. 18.  Accordingly, we believe the most sensible reading of the ALJ's decision is that
the ALJ concluded that Dr. Schaich and Dr. Broska's findings, including the moderate limitation
they identified in "regulating emotions, controlling behavior, and maintaining well-being," was
adequately addressed by his RFC limitation that Mangual be limited to "simple, repetitive,
routine tasks."  R. 14.

As a general matter, moderate limitations are not an impediment to the ability to perform
gainful activity, particularly when an RFC has already limited a claimant to unskilled, routine
work.  See Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (where "[n]one of the clinicians
who examined [Petitioner] indicated that she had anything more than moderate limitations in her
work-related functioning," "the ALJ's determination that Petitioner could perform her previous
unskilled work was well supported"); Bradley W. v. Comm'r of Soc. Sec., 2020 WL 5848833, at
*12 (N.D.N.Y. Oct. 1, 2020) ("Even if the ALJ erred in failing to adopt both providers'
'moderate' limitations in plaintiff's ability to maintain a schedule, a 'moderate' restriction is still
consistent with the ability to perform substantial gainful activity, and would at most, be harmless

error."); <u>Melisa G. v. Berryhill</u>, 2019 WL 2502726, at *5 (N.D.N.Y. June 17, 2019) (noting that "moderate limitations are not prohibitive of performing unskilled work").

Moreover, while the ALJ did not separately discuss Mangual's capacity to regulate emotions, control behavior, and maintain well-being in his discussion of Dr. Schaich and Dr. Broska's opinions, the ALJ elsewhere in his decision provided reasons for his finding that Mangual was only mildly limited in this area. The ALJ explained that, as to Mangual's ability to "adapt[] or manag[e] [her]self," he found her only mildly limited, as "[t]he treatment record does not contain references to any significant problems with personal care or hygiene," and "[t]here is little indication in the medical record that the claimant cannot perform most household chores and daily activities due to mental limitations." R. 13. An "ALJ need not 'slavishly recite . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear.'" <u>Batchelor v. Berryhill</u>, 2019 WL 422527, at *4 (S.D.N.Y. Feb. 4, 2019) (punctuation omitted); <u>see</u> <u>Matta v. Astrue</u>, 508 F. App'x 53, 56 (2d Cir. 2013) (noting that an ALJ's RFC assessment does not need to "perfectly correspond with any of the opinions contained in the record"). And while Mangual argues that the ALJ failed to comply with SSR 96-8p, <u>see</u> Pl. Mem. at 21,[2] the ALJ's decision quoted from this regulation, <u>see</u> R. 14, and the ALJ expanded upon his earlier analysis of the areas of mental functioning, ultimately concluding during his RFC analysis that Mangual's mental impairments limited her to "simple, unskilled tasks," R. 18, but did not limit her further. Because the ALJ's decision identifies evidence in the record that formed the basis of

---

[2]   In particular, Mangual quotes the portion of the regulation that provides that "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." SSR 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996).

his decision not to accept the opinions of Dr. Schaich and Dr. Broska, we conclude that there was no error in this aspect of the ALJ's decision.

Finally, Mangual argues that the ALJ failed to adequately explain his rationale for not incorporating the physical limitations suggested by Dr. Long and by the state agency examiners into his RFC.  See Pl. Mem. at 21-22.  Mangual argues that the ALJ was incorrect in stating that Dr. Long had not "explain[ed] the actual limitation in [Mangual's] physical abilities."  See id. at 22 (quoting R. 17).  For the reasons already stated, we discern no error in the ALJ's handling of Dr. Long's opinion given its vagueness.  As to the state agency opinions and their finding that Mangual should be limited to light work, the ALJ explained that he did not credit these opinions because they "did not have sufficient evidence to make an informed decision regarding claimant's impairments."  R. 18.  The ALJ expanded on this conclusion, explaining that the evidence was inconsistent with the state examiners' opinions as to Mangual's asthma, her mental impairments, and her pain.  See id.  The state agency opinions found Mangual had no postural or manipulative limitations, see R. 148, 157, and each listed pain as her only symptom, see R. 146-47, 155-56.  The ALJ's reasons for concluding that Mangual's pain was not severe     the fact that "her activities of daily living show that she has no limitations in physical function," and "[h]er lack of treatment" for her physical ailments, R. 17     provide sufficient justification for rejecting the state agency examiners' opinions as to her physical limitations.  The ALJ was also entitled to rely on the fact that these opinions were offered by "non-examining and non-treating expert sources" in his decision to not find them persuasive.  See Danette Z. v. Comm'r of Soc. Sec., 2020 WL 6700310, at *6 (N.D.N.Y. Nov. 13, 2020) ("It is incorrect for an ALJ to place

significant weight on the findings of a non-examining source that differs from other medical evidence of record and is not adequately explained." ).

Accordingly, for each of the areas of the ALJ's decision Mangual argues are unsupported or inadequately explained, we find that the ALJ has complied with his obligations as set forth in SSA regulations and identified substantial evidence in the record in support of his decision.

      D.    <u>Whether the ALJ failed to address discrepancies between the DOT and the VE's testimony</u>

Mangual argues that the ALJ erred at step five by failing to address alleged discrepancies between the VE's testimony and the DOT.  <u>See</u> Pl. Mem. at 22-23.  Mangual argues that, given the ALJ's conclusion that Mangual could not read or write in English, the VE's testimony that Mangual could perform work as a cafeteria attendant, assembler, and electronic subassembler conflicted with the DOT, insofar as the DOT requires workers in those occupations to possess certain levels of literacy.  <u>Id.</u>  Defendant replies that the DOT lists the maximum requirements for occupations, not the minimum, and that the VE explained the basis for his conclusion that Mangual was capable of performing this work, pursuant to SSR 00-4P.  <u>See</u> Def. Opp. at 10-11.

SSR 00-4P sets forth the SSA's "standards for the use of [VEs]" by ALJs.  SSR 00-4P, 2000 WL 1898704, at *1 (S.S.A. Dec. 4, 2000).  SSR 00-4P provides that a VE's testimony "generally should be consistent with the occupational information supplied by the DOT," and specifically requires that an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the [DOT]." <u>Id.</u> at *1-2.  SSR 00-4P places an affirmative obligation on the ALJ to "[a]sk the VE . . . if the evidence he or she has provided conflicts with information present in the DOT; and [i]f the VE's

. . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable

explanation for the apparent conflict." Id. at *4.  Thereafter, the ALJ must "[e]xplain in the

determination or decision how any conflict that has been identified was resolved."  Id.  However,

SSR 00-4P also provides that "[t]he DOT lists maximum requirements of occupations as

generally performed, not the range of requirements of a particular job as it is performed in

specific settings.  A VE . . . may be able to provide more specific information about jobs or

occupations than the DOT."  Id. at *3.  We note that the record is clear that Mangual speaks

English and does not indicate that she uses any other language.  See, e.g., R. 282-83, 424.

　　　As noted, the ALJ's questions for the VE contemplated a hypothetical worker that was

unable to read or write in English, see R. 135-36, and the ALJ's written decision ultimately found

that Mangual "cannot read or write," R. 18.  The Court agrees with Mangual that there was a

discrepancy between the DOT listings, which indicate that the positions of cafeteria attendant,

assembler, and electronic subassembler each call for some level of literacy, and the VE's

testimony that the three identified occupations could be "performed through demonstration."  R.

136.  The Court further agrees that this discrepancy is the form of "conflict" under SSR 00-4P

that requires inquiry by an ALJ and explanation by a VE.  See, e.g., Jimenez v. Berryhill, 2018

WL 4054876, at *9 (E.D.N.Y. Aug. 24, 2018) (VE's conclusion that claimant could perform

work for which DOT listing prescribed a higher reading level was a conflict under SSR 00-4P);

Durakovic v. Comm'r of Soc. Sec., 2018 WL 4039372, at *10 (N.D.N.Y. May 30, 2018)

(difference in DOT listing's reading level and VE testimony constituted a conflict), adopted,

2018 WL 4033757 (N.D.N.Y. Aug. 23, 2018); see also Rholetter v. Colvin, 639 F. App'x 935,

938 (4th Cir. 2016) (holding the ALJ erred by relying on the VE's testimony when the VE failed

to explain the conflict between the claimant's limitation to reading at a first- or second-grade level and the jobs identified by the VE which require a higher Language Development level).

Having found that a conflict existed between the DOT and the VE's testimony, the Court next asks whether the ALJ "obtain[ed] a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the [DOT]." SSR 00-4P at *1. The Court concludes that the ALJ did so with respect to the electronic subassembler position because the VE testified that the position of subassembler of electronics "could be performed through demonstration" and that he had previously "placed people who could do this job who were illiterate." R. 136.

However, when the ALJ asked whether there was "other work in the national economy for somebody with those abilities," the VE addressed two additional occupations and was simply not clear as to whether a completely illiterate person such as Mangual could perform those jobs. The VE stated:

> Yes. Let's see. Yes. A cafeteria attendant, and the DOT number is 311.677-010, the SVP: 2, unskilled, light duty. There are 139,000 of those jobs in the United States. That occupation could be performed through demonstration and such. I have placed individuals (INAUDIBLE) residential programs who are able to do that work. So, that does not require any illiteracy   <u>very much literacy</u>. There's no reduction of the numbers as a result. And then there's the occupation of the assembler of communication equipment. The DOT is 729.687-010, the SVP: 2, unskilled, light duty. There are 5,200 of those jobs in the United States.

<u>Id.</u> (emphasis added). The Court concludes that the VE's statement that the cafeteria attendant job does not require "very much literacy" is simply inconsistent with the ALJ's determination that Mangual "cannot read or write." R. 18. Given the use of the phrase "very much literacy" as applied to the cafeteria job, the testimony is similarly unclear as to the "assembler of

communication equipment" and whether that too was a job that could be performed only by a person with some degree of literacy.  It is unclear if the ALJ would (or could) have found that jobs for subassemblers of electronics alone exist in sufficient numbers in the national economy. Accordingly, the case must be remanded for clearer findings as to whether there are jobs in the national economy that can be performed by a person with the claimant's limitations.

IV.    CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings (Docket # 21) is denied, and Mangual's cross-motion for judgment on the pleadings (Docket # 29) is granted.  The case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  The Clerk is requested to enter judgment and to close this case.

SO ORDERED.

Dated:  April 28, 2022

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

28